UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
                                              :
RA'ED MOHAMAD IBRAHIM MATAR,        :        05 Civ. 10270 (WHP)
et al.,                                       :
        Plaintiffs,                       :
                                              :
    -against-                             :
                                              :
                                              :
AVRAHAM DICHTER,                     :
                                              :
       Defendant.                        :
----------------------------------------------------X

## DECLARATION OF PROFESSOR ANTONIO CASSESE
**Florence, Italy**

### I. QUALIFICATIONS (CV IS ATTACHED) (cv is attached)

1. I have been full professor of international law at Florence University for many years ( since 1975). I have also served on the Italian Delegation to the Geneva Diplomatic Conference on the Reaffirmation of International Humanitarian Law (1971-74). In 1993 I was elected by the UN General Assembly to become a judge on the International Criminal Tribunal for the Former Yugoslavia (I was granted an unpaid leave of absence by Florence University). I was a Judge between 1993 and 2000 and President of the Tribunal between 1993 and 1997. In 2004 I was appointed by the UN Secretary-General Chairman of the UN Commission of Inquiry into Crimes in Darfur (Sudan).

### II. PURPOSE OF DECLARATION

2. I have written this Declaration because I strongly believe that a democratic State such as Israel, built on the principles of the rule of law and respect for human rights, may not afford to leave unpunished acts that grossly breach fundamental norms of human rights law and international humanitarian law. What distinguishes Israel as the only democratic State in the area, from other States that are instead authoritarian and constantly trample upon human rights, is precisely its keen attention to the values of human rights and justice. It follows, that, if the facts alleged in the complaint lodged with the US Court are proved, those responsible for such blatant breaches of international law and the basic values of human life must be brought to book.
I very much hope that my Declaration may contribute to clarifying the legal framework of the events raised in the complaint (events whose factual occurrence I have no independent means of verifying).

## III. OPINION

### PART I
#### GAZA AS A TERRITORY UNDER BELLIGERENT OCCUPATION AT THE TIME OF THE EVENT

3. There is no doubt that the Gaza strip, at the time when the events at issue occurred (2002) was a territory under belligerent occupation, on the strength of customary international law and the IVth Geneva Convention of 1949 relative to the Protection of Civilian Persons in Time of War. At that time the Israeli troops were still occupying the territory. Consequently the bulk of international rules on *occupatio bellica* applied. Normally belligerent occupation of foreign territories is short, and the occupant confines himself to maintaining order (perhaps the longest occupation during World War II was that of the Netherlands by Germany, 1940-45). What distinguishes Israel's occupation of the Gaza Strip and the West Bank is that (i) the occupation has had a long duration, and (ii) armed violence within the occupied territories has broken out, with Palestinians resorting to terrorist acts or to armed action proper (against the Israeli troops) and the Israeli army responding by extensively resorting to armed action.

4. That the Gaza Strip, at least until the Israeli removal of settlements and withdrawal of military personnel (15 August-12 September 2005), was under belligerent occupation is borne out by the various statements made in September 2005, including one by Prime Minister Sharon to the UN General Assembly, to the effect that since September 2005 Gaza was no longer to be considered as occupied territory. This means that until that date for Israeli authorities Gaza was under belligerent occupation.

5. That in the relevant period Gaza was an occupied territory is clearly stated by distinguished Israeli scholars. See for instance E. Benvenisti, *The International Law of Occupation*, 2nd printing 2004 (Oxford: Oxford University Press, 2004) at 108-124.

6. Also Israeli case law is to the same effect. See for instance the decision of the Supreme Court of Israel sitting as High Court of 10 April 1988, on three cases of deportation from the Gaza Strip or the West Bank, H.C. 785/87, H.C. 845/87, H.C. 27/88, in 29 *International Legal Materials* (1990), 139-181.

7. It follows that the aforementioned armed clashes are legally governed by the whole body of international humanitarian law (IHL), which imposes on both parties well defined restraints in the interest of the civilian population and with a view to introducing a modicum of fair play into military violence.

### PART II
#### IS THE 'TARGETED KILLINGS' POLICY CONSONANT WITH INTERNATIONAL HUMANITARIAN LAW?

8. International law allows targeting a civilian (in an occupied territory, or in an war zone in the case of an armed conflict between two States) only as long as he takes a direct part in hostilities. It is wrong to hold the view that under international law a civilian who takes a direct part in hostilities is a lawful objective *at all times*, namely not only as long as he is carrying out an armed action or a terrorist act but also while he is preparing it or after it has completed it.

2

9. The ICRC Commentary to art. 51(3) of Protocol I of 1977 additional to the Four Geneva Conventions of 1949, and relating to the Protection of Victims of International Armed Conflict (hereafter: Protocol I of 1977) supports this view. If a civilian takes a direct part in hostilities he becomes a legitimate object of attack not only at 'the time that the civilian actually makes use of a weapon, but also [...] [in] situations in which he undertakes hostile acts without using a weapon...It is only during such participation [direct participation in hostilities] that a civilian loses his immunity and becomes a legitimate target. Once he ceases to participate, the civilian regains his right to the protection under this Section, i.e., against the effect of hostilities, and he may no longer be attacked' (ICRC, *Commentary to Protocol I*, Geneva, 1987, at 619).

10. Art. 51(3) of Additional Protocol I of 1977 has turned into customary law and therefore is binding on Israel as well *qua* customary law. Article 51(3) restates and spells out a notion that is already in Article 3 common to the four Geneva Conventions of 1949 ('*persons taking active part in the hostilities*... shall in all circumstances be treated humanely...'; emphasis added). Common Article 3, as authoritatively held by the International Court of Justice (in *Nicaragua* (*Merits*), 27 June 1986, at para 218) has become part of customary international law and lays down principles applicable in *any* armed conflict. Article 51(3) restates and specifies – with regard to international armed conflicts - the principle relating to *the conditions on which* civilians are entitled to immunity from attack.

11. The rationale behind the prohibition to target a civilian who does not take a direct part in hostilities, despite his possible (previous or future) involvement in fighting, is linked to the *need to avoid killing innocent civilians.* Before firing at enemy civilians it is necessary to identify the person allegedly responsible for acts of violence, i.e. establish whether he is an innocent civilian or an unlawful combatant. If the civilian is caught while engaging in armed action on the battlefield, carrying arms openly, there may be no doubt about his status and his personal responsibility for unlawfully attacking the enemy belligerent. In other circumstances, the law enforcement authorities of the enemy belligerent must satisfy themselves that the civilian is unlawfully engaging in the preparation and/or execution of a specific crime, that is, *he is not an innocent civilian.*
Clearly, if a belligerent were allowed to fire at any enemy civilians *simply suspected* of in some sort planning or conspiring to plan military attacks, or of having planned or directed hostile actions, the basic foundations of IHL would be undermined. The *fundamental distinction between civilians and combatants* would be called into question and the whole body of IHL would eventually be eroded.

12. The other rationale behind the prohibition to attack civilians who do not take a direct part in hostilities *aims at protecting irregular combatants fulfilling the legal requirements for participating in belligerent action.* Whenever a civilian (member of a paramilitary or guerrilla unit or militia corps or terrorist group) engages in military action and carries arms openly before and during any attack on the adversary, the fact of carrying arms openly *shields him from war crimes prosecution.* In other words, if captured, he will not be liable to prosecution for the mere fact of taking part in combat, and must be granted prisoner of war status.

13. In any case, even assuming that the above arguments appear to be unconvincing, one still would have to rely upon the *general principles relating to the protection of civilians* as may be derived from the Hague Regulations of 1907 and the Geneva Conventions of 1949. *Those principles* pursue the purpose of protecting civilians as much as possible. They among other things intend to prevent the belligerent from abusing his powers or attacking civilians under the pretext that they may be dangerous to the belligerent army. Furthermore, the principles prescribe that belligerents use lethal force against civilians only when it is absolutely sure that

3

civilians are taking active part in hostilities and as an *extrema ratio*, when any other method has proved or may reasonably prove pointless. As the Inter-American Court of Human Rights held in *Neira Alegria* (19 January 1995, Ser. A, no.20, at para 75), 'regardless of the seriousness of certain actions and the culpability of the perpetrators of certain crimes, the power of the State is not unlimited, nor may the State resort to any means to attain its ends'. It follows that belligerents must always try first of all to detain civilians engaging in hostilities and use lethal force only if it proves absolutely impossible to arrest or capture them (see also the *McCann and others* case, European Court of Human Rights, 5 September 1995, paras 146-150, 194, 213).

14. Pursuant to the principles under discussion, after establishing that it absolutely impossible to detain a civilians suspected of engaging in military or terrorist action, a belligerent, before carrying out an attack is under the obligation to *ascertain* that it is not in fact aiming at a civilian who is not taking a direct part in hostilities. Obviously, if the civilian carries arms openly, he forfeits his privileged status and may be attacked. In other circumstances (for instance when a civilian is suspected of concealing arms, or may be preparing a terrorist attack at his home, or, under the guise of driving to his working place, is instead going to the place where he will plant a bomb, etc.) he may be targeted only if he has not complied with a *summons* issued by the occupant to the effect that he should show that he is not about to carry out a terrorist act or is not returning from terrorist action. If it is *manifest* that a civilian is trying to conceal weapons destined, for example, to blow up enemy persons or installations and there is absolutely no time for a summons, a belligerent may attack the civilian, subject however to (1) the subsequent conduct of an independent enquiry into the event to establish whether the attack was justified, and (2) the granting of compensation to the family of the victim if it turns out that the suspected terrorist was in fact a harmless civilian.

15. It is clear from the principles referred to above that it is prohibited to attack a civilian suspected of terrorism while, for instance, he is going by taxi to a near place or village, or is in his home (whether or not he is resting there or spending time with his family, or instead planning terrorist actions). In these cases the belligerent must *apprehend* the suspected terrorist. He may use lethal force only if the terrorist refuses to surrender and reacts by using armed violence.

# PART III
## PROHIBITION TO BOMB AN INHABITED CIVILIAN BUILDING IN A POPULATED AREA

### A. The principle of distinction

Fundamental value and customary nature of the principle

16. The principle of distinction, according to which belligerents shall at all times distinguish between the civilian population and combatants, is one of the fundamental tenets of IHL. The principle has a twofold articulation: on the one hand, it prohibits attacks against the civilian population and civilian objects; on the other, it only allows attacks directed against military objectives.

17. There exists a wealth of practice supporting the contention that the principle of distinction not only constitutes the bulk upon which the overall IHL structure is built, but also has since long acquired customary status. I shall limit myself to mentioning only the most prominent examples of such practice. Numerous military manuals (e.g., United States, *Air Force Pamphlet* (1976), § 5-3(a)1(a) and 5-3(b); Israel, *Law of War Booklet* (1986), ch. 1.3; United Kingdom, *Manual of the Law of Armed Conflict* (2004), ch. 2, para 2; Germany, *Military*

4

*Manual* (1992), §§ 401 and 404), and international treaties (e.g., *IVth Geneva Convention of 1949*, art. 147, define wilfully causing great suffering or serious injury to body or health as a grave breach of the Convention, thus entailing individual criminal responsibility of the author of the act; the *Statute of the International Criminal Court*, Art. 8(2)b(i), (ii) and (iv), categorizing an intentional direct attack against the civilian population as such, individual civilians or civilian objects as a war crime, explicitly prohibits attacks against civilians and civilian objects. The principle is codified in art. 48 and spelt out in art. 51 of Protocol I of 1977..

18. In the Advisory Opinion on *Legality of the Threat or Use of Nuclear Weapons*, ICJ Rep. (1996) at 257, para. 78, the International Court of Justice defined the principle of distinction as one of the 'cardinal principles contained in the texts constituting the fabric of humanitarian law' and also one of the 'intransgressible principles of international customary law'. In 2002, the International Criminal Tribunal for the former Yugoslavia confirmed in *Kordić and Cerkez*, Judgment of 26 February 2001, para 326-328, that there is no doubt about the customary nature of the rule prohibiting attacks against civilians and civilian objects, hence applying to all kinds of conflict. In 2005 the Eritrea-Ethiopia Claims Commission affirmed that articles 48 and 51 of Protocol I of 1977 'represent the best and most recent efforts of the international community to state the law on the protection of the civilian population against the effects of hostilities. The Commission considers them to express customary international humanitarian law' (*Partial Award, Western Front, Aerial Bombardment and Related Claims, Eritrea's Claims 1, 3, 5, 9-13, 14, 21, 25 & 26*, The Hague, December 19, 2005, paras 93 and 95).

19. The legal literature unanimously considers the principle of distinction as the bedrock of IHL. For example, according to Y. Dinstein the principle is the 'kernel' of IHL as it currently stands (*The Conduct of Hostilities under the Law of International Armed Conflict*, Cambridge: Cambridge University Press, p. 115), while S. Oeter states that 'The overall validity of this principle is today beyond any doubt' (in D. Fleck (ed), *The Handbook of Humanitarian Law in Armed Conflicts*, Oxford: Oxford University Press, 1999 at 113) In brief, the principle of distinction is so fundamental to IHL that its disregard would cause the whole IHL construction to collapse, with the consequence that belligerents would go back to a fighting method where 'the strong do what they can and the weak suffer what they must' (R. Crawley, translation from Thucydides, *The Peloponnesian War* (New York: Dolphin Books) at 359).

Scope of the principle: prohibition of attacks directed at civilians or civilian objects alone

20. The principle of distinction is relevant to our purposes in that it is specified by *the rule prohibiting attacks directed at civilians or civilian objects alone*. There is general agreement that an attack which is specifically aimed against civilians is prohibited and, if committed, amounts to a war crime. This is an absolute prohibition in respect of which no exception exists and the military necessity defence may not be raised.

21. In the case under examination, the IAF allegedly attacked a three-storey apartment building located in Al-Daraj neighbourhood in Gaza City, not on account of its civilian character, but because it hosted a person (a dangerous terrorist) that the attacker considered as a combatant, hence a legitimate objective. Assuming that the targeted person was indeed a combatant (the status of Mr Saleh Mustafa Shehadeh and the question of whether he was to be regarded as a civilian or a combatant does not fall within the purview of this Declaration) the presence of a combatant in a civilian building does not *ipso facto* render the building a

military objective. On the contrary, a civilian building, especially if located in a populated area, enjoys the presumption of a civilian object, hence immunity from attack.

22. Let us assume that the wanted person was using its apartment to organise actions connected with the war effort. Would such an occurrence justify attacking the building? According to a widely accepted definition (on the customary nature of which see Eritrea-Ethiopia Claims Commission, *Partial Award, Western Front, Aerial Bombardment and Related Claims, Eritrea's Claims 1, 3, 5, 9-13, 14, 21, 25 & 26*, The Hague, December 19, 2005, para 112 ff.) only those objects which fulfil two criteria are *legitimate targets*. First, those objects which, *inter alia* by their use make an effective contribution to military action; and, second, those objects whose neutralization, in the circumstances ruling at the time, offer a definite military advantage.

23. Depending on the circumstances, it might be argued that the apartment where Saleh Mustafa Shehadeh was living in was a military objective if employed, for example, to make bombs for direct use as a means of fighting the IDF. In addition, it is plausible to assume that the respondent would be able to show that the elimination of Saleh Mustafa Shehadeh offered to Israel a definite military advantage at the time. *However, those two elements, even if supposedly present in the context of this attack, would only warrant an attack directed at Saleh Mustafa Shehadeh apartment's alone. It would never justify an attack on the entire building where his apartment was located.*

## B. Interplay of the principle of distinction with the principle of precaution

The prohibition to launch an indiscriminate attack

24. The principle of distinction prohibits not only attacks which are deliberately directed only at civilians, but also those military actions which involve the civilian population as a consequence of a legitimate attack. These are the so-called *indiscriminate attacks*. In such indiscriminate attacks the intention to specifically hit civilians is not present; the attacker merely neglects to take into consideration possible collateral damages while planning the military action. In other words, the attacker fails to take those precautionary measures which would avoid unnecessary losses of civilians or damage to civilian property.

25. The lack of care, on the part of the attacker of the Al-Daraj building, to spare civilians and civilian objects is evidenced by the choice of means and the circumstances of the attack.

Choice of means of combat

26. The fact that the respondent did not put in place the necessary precautionary measures (or had the intention to target the whole building and not exclusively Saleh Mustafa Shehadeh's apartment) is evidenced by the choice of the means of attack. The use of a 1000 kilogram (2,205 pound) bomb to target a single person, or even an apartment, is manifestly out of proportion to the objective the attacker intended to achieve. If the attacker intended in good faith to target the wanted person solely, he should have used both a means of combat with less destructive capacity and a more precise weapon. In other words, *the use of indiscriminate weapons constitutes an indiscriminate attack on civilians* (in this sense, cf. the 1996 Advisory Opinion of the International Court of Justice, para. 78).

6

Circumstances of attack

27. Also the circumstances in which the attack took place provide some indication about the lack of care for civilians and civilian objects on the part of the IDF. Allegedly the attack was carried out by the IAF at approximately 11:55 pm. It is obvious to expect that at that time civilians, especially children, are at home and probably asleep. One of the feasible precautions that the IAF should have taken to spare civilian lives was to attack the building when civilian were expected to be outside, for example at a time when children were at school and women at the market. Because of the time chosen, it is not surprising that fifteen innocent civilians, including eight children, where killed in the attack in Al-Daraj of July 22, 2002. In this regard, it should be recalled that some military manuals, for example *The Manual of the Law of Armed Conflict* of the United Kingdom (2004), ch. 5, para 5.32.6, explicitly states, with respect to the obligation to take precautionary measures, that 'The timing of an attack can be important. If it is known, for example, that a bridge is heavily used by civilians during the day but hardly at all at night, a night-time attack would reduce the risk of civilian casualties'.

28. In addition, had the attacker taken care to spare civilians, it could have targeted the wanted person while in a less populated area.

29. *In short, failure to take all feasible precautions before and/or during an attack aimed at avoiding incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the precise military advantage anticipated amounts to an indiscriminate attack.*

30. *It should be noted that an indiscriminate attack amounts to a war crime.*

## C. The principle of proportionality

31. The principle of proportionality in attack is another fundamental principle of IHL of a customary nature (for authorities on the customary nature of the rule see J.-M. Henckaerts and L. Doswald-Beck, *Customary International Humanitarian Law* (Cambridge: Cambridge University Press, 2005, at 46 ff.). The rationale underlying such principle is the existence, in the international legal order, of diversified interests which are potentially conflicting with one another (M. Cohen-Eliya, 'The formal and substantive meanings of proportionality in the Supreme Court's decisions regarding the Security Fence', *Israel Law Review* (2005) at 264). In IHL, the principle aims at weighing the dictates of military necessity and exigencies of humanity. Though codified at art. 51(1)b of Protocol I of 1977, the principle of proportionality constitutes an interpretative tool, or a legal technique, rather than a rule with a precise and well-defined content. However, this specific character of the principle does not deprive it of any material content. A recent and very important judgement of the Supreme Court of Israel shed light on the criteria which may be applied when attempting to evaluate compliance of a specific act with proportionality.

32. In *Beit Sourik Village Council v. the Government of Israel and Commander of the IDF Forces in the West Bank* (judgment, 30 June 2004, HCJ 2056/04) the court distinguished three parameters to evaluate respect for the principle of proportionality. In the first place, (i) the relationship between the means used to achieve the objective and the established purpose of the action. This criterion represents the traditional attempt to weigh means and aims, an operation that the Supreme Court labels as the "rational means test". In the second place, (ii) the choice of the means which are the least injurious to individual rights (the so-called "least

7

injurious means test"). Lastly, (iii) the balance between damages caused and benefits gained (this is the proportionality test *stricto sensu*).

33. In the case at issue, all three parameters appear to have been violated. The rational means test was not met because the attacker could have found other methods to neutralize the wanted person, e.g. firing shells from the ground and at close range.
The least injurious test was breached as the means adopted was out of proportion to the objective compared to the means at the disposal of the attacker.
Finally, there can be no doubt that the damages caused were awfully out of proportion to the advantages gained: nobody would deny the manifest disproportion between the death of 15 innocent civilians, the injury of 150 persons and the destruction of 9 buildings, on the one hand, and the objective to kill one single individual, however dangerous he might have been, on the other.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 21 of April 2006 at Florence, Italy

_____signed_____ _[signature]_
Antonio Cassese


## *Curriculum Vitae*

### PROFESSOR ANTONIO CASSESE

- Born in Italy in 1937

- **Professor of international law**, University of Pisa (1972-74); since 1975 Professor of international law, University of Florence; in 1987-93 professor of law at the "European University Institute"; Visiting fellow, All Souls College, Oxford University (1979-80)

- Member of the **Italian delegation** to the UN Commission on Human Rights (1972-75), the UN General Assembly (1974, 1975, 1978), and the Geneva Diplomatic Conference on International Humanitarian Law (1974-77)

- **Member and Chairman**, Council of Europe Steering Committee on Human Rights (1984-88); **member and President**, Council of Europe Committee against Torture (1989-93)

- **Judge** (1993-2000) and **President** (1993-1997) of the UN International Criminal Tribunal for the former Yugoslavia

- **Chairman** of the UN **International Commission of Inquiry into Genocide in Darfur** (Sudan) (appointed by the UN Secretary Kofi Annan on 7 October 2004) 2004-2005


*Academic activities:*

- **Doctor in Law** *honoris causa*, Erasmus University of Rotterdam (1998), University of Paris X (1999), University of Geneva (2000), University of Athens Panteion (2006)

- **Has lectured** in Paris (Collège de France, Paris-1-Sorbonne, Paris II, Paris XIII), Cambridge (Sir Hersch Lauterpacht Lectures) ; Oxford (Sir Isahia Berlin Lectures); Gröningen (B.V.A. Röling Lectures), Brussels and Louvain ( Henri Rolin Lectures), New York (Columbia University), Boston (Harvard Law School), London (London School of Economics, Chorley Lecture)

- Holder of the **International Research Chair "Blaise Pascal"** (University of Paris-Sorbonne), 2001-2002

- Winner of the **2002 International Prize** granted by the "Académie Universelle des Cultures" presided over by the Nobel Peace Prize Elie Wiesel, "for the exceptional contribution to the protection of human rights in Europe and the world"

- **Member** of the *Institut de droit International* (since 1995)

- **Certificate of merit,** American Society of International Law, 1996 (for the book "Self-determination of Peoples   A Legal Reappraisal")

- **Robert G. Storey Award for Leadership,** South-Western Legal Foundation, Dallas, Texas, 1997

- **Director,** Ethics Project (a three-year project financed by the European Commission and managed by the European University Institute, for high-level training of national judges and prosecutors in international criminal law, with particular reference to the International Criminal Court), 2003-2006

- **Distinguished Global Fellow**, New York University School of Law, 2004

- **Received** in 2005 from the Mr. C.A. Ciampi, President of the Italian  Republic the highest honour ("*Cavaliere di Gran Croce*") for his scientific and professional achievements

- **Co-founder and co-editor** of the *European Journal of International Law* (published by Oxford University Press)

- **Founder and Editor-in-Chief** of the *Journal of International Criminal Justice* (published by Oxford University Press)


*Private practice:*

-**Consultant,** Tunisia   Government (Libyan-Tunisian dispute on the Continental Shelf, brought before the *International Court of Justice*), 1979-81

-**Advisor and Counsel** for Iran, US-Iran International Claims Tribunal, 1986-93

-**Counsel** for Chad in the Libyan-Chad Dispute on the Aouzou Strip, *International Court of Justice,* 1989-93

-**Consultant**, Council of Europe, 2001-2

-**Consultant**, European Union Parliament, 2003

- **Counsel for applicants**, European Court of Human Rights, 2004-2006


### *Principal publications:*


-*Violence and Law in the Modern Age* (Cambridge: Polity Press, 1986); translated into French and Japanese

- *International Law in a Divided World* (Oxford: Oxford University Press, 1986) translated into French and Italian

- *Terrorism, Politics and Law* (Cambridge: Polity Press, 1989)

-*Human Rights in a Changing World* (Cambridge: Polity Press, 1990), translated into Spanish and Indonesian

-*The Tokyo Trial and Beyond* (with B.V.A. Röling) (Cambridge: Polity Press, 1993), translated into Japanese

- *Self-determination of Peoples – A Legal Reappraisal* (Cambridge, Cambridge University Press, 1995)

- *Inhuman States – Imprisonment, Detention and Torture in Europe Today* (Cambridge: Polity Press, 1996)

- *International Law* (Oxford University Press, 2001); second edition published in 2005; translated into Chinese, Portuguese and Persian

- *Crimes internationaux et juridictions internationales* (editor with M.Delmas-Marty), (Paris: Presses Universitaires de France, 2002)

- *Juridictions nationales et crimes internationaux* (editor with M. Delmas-Marty) (Paris: Presses Universitaires de France, 2002)

- *The Rome Statute of the International Criminal Court : A Commentary*, 3 vols. (editor in chief) (Oxford, Oxford University Press, 2002)

- *International Criminal Law* (Oxford University Press, 2003); translated into Persian, Serbo-Croatian and Italian

- *Oxford Companion to International Criminal Law and Justice* (editor in chief), Oxford University Press (forthcoming)

10